**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DANNY CUNNINGHAM, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 5:04-CV-282** |
| **OFFSHORE SPECIALTY** | § | |
| **FABRICATIONS, INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## ORDER

Currently before the Court are Amended Motion to Dismiss in Response to Plaintiff's

Fourth Amended Complaint (Dkt. No. 220) by Global Industries Offshore L.L.C. and Global

Industries, Ltd. ("Global Defendants"), Motion to Dismiss Motion to Dismiss Plaintiff's Fourth

Amended Complaint (Dkt. No. 221) by Humares BV ("Humares"), Oceanwide Offshore Services

("Oceanwide Offshore"), O.W.I Limited (Oceanwide International) ("O.W.I."), and Oceanwide

Houston, Inc.'s ('Oceanwide Houston"), Motion to Dismiss Fourth Amended Complaint (Dkt.

No. 222) by J. Ray McDermott, Inc. ("McDermott"), Motion to Dismiss Fourth Amended

Complaint (Dkt. No. 223) by Horizon Offshore, Inc., Horizon Offshore Contractors, Inc., and

Horizon Vessels, Inc. ("Horizon Defendants"), Motion to Dismiss Fourth Amended Complaint

(Dkt. No. 224) by Helix Energy Solutions Group Inc. F/K/A Cal Dive International, Inc.

("Helix"), Motion to Dismiss Plaintiff's Fourth Amended Complaint (Dkt. No. 225) by Offshore

Specialty Fabricators, Inc. and Offshore Express, Inc. ("Offshore Defendants"), Motion to

Dismiss Complainants' Fourth Amended Complaint and Request for Preliminary and Permanent

Injunctions (Dkt. No. 226) by Stolt Offshore, Inc ("Stolt"), and Motion to Dismiss Plaintiffs'

1

Fourth Amended Complaint (Dkt. No. 232) by C-MAR America, Inc., C-MAR Group Holdings, Inc., C-MAR Group Holdings Limited, and C-MAR Services (UK) Limited ("C-MAR Defendants").

Having considered the briefing and all relevant papers and pleadings, the Court finds that Defendants' motions (Dkt. Nos. 220, 221, 222, 223, 224, 225, and 232) should be **DENIED-IN-PART** and **GRANTED-IN-PART**.  Stolt's Motion to Dismiss (Dkt. No. 226) shall be **GRANTED**.

## I.  Procedural History

Plaintiffs Danny Cunningham, Pablo Rubio Llamas, Jacob Van Dyke, Bernard Coleman, Todd Crews, Raphael Young and Wendell Smith, individually and on behalf of those similarly situated, filed a Third Amended Complaint on August 5, 2005 against Offshore Defendants, Horizon Defendants, McDermott, Stolt, Helix, and Global Defendants, collectively known as "Service Defendants," and also against O.W.I., Oceanwide Offshore, Oceanwide Houston, Humares, and C-MAR Defendants, collectively known as "Manning Defendants."  Defendants Third Amended Complaint, Dkt. No. 66 at 1-2.

Plaintiffs define the Service Defendants as "the largest transporters of merchandise in the coastwise trade between points in the United States, and also some of the largest service providers to those prospecting for and developing oil and gas mineral deposits on the Outer Continental Shelf of the United States, including the Gulf of Mexico (the "OCS")."  *Id.* at 13; Fourth Amended Complaint, Dkt. No. 219 at 13-14.  Plaintiffs define the Manning Defendants to be "some of the largest providers of crew recruitment and contract labor services to the maritime industry."  Dkt. No. 66 at 15-16; Dkt. No. 219 at 15-16.  In other words, the Manning Defendants obtain workers for projects and services offered by the Service Defendants.

Plaintiffs brought a class action for "damages caused by the loss of American jobs, the depression of wages, and the loss of benefits to American citizens and aliens lawfully admitted to the United States for permanent residence ("Legal Workers")." *Id.* at 2.  Plaintiffs alleged that the Service Defendants "illegally depress the wages paid to their employees who work on vessels, rigs, platforms and other vehicles or structures on the [OCS], by employing large numbers of illegal workers to perform the work of the Service Defendants (the "Illegal Worker Hiring Scheme")." *Id.*

Thus, Plaintiffs brought a cause of action against the Service Defendants for engaging in the Illegal Worker Hiring Scheme in violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Dkt. No. 1 at 13-17.  Plaintiffs alleged that the Illegal Worker Hiring Scheme violates two provisions of Section 274 of the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. § 1324(a)(1)(A)(iii) and 1324(a)(3)(A).  Dkt. No. 1 at 17.

Plaintiffs also alleged that the Service Defendants use the Manning Defendants to staff projects.  *Id.* at 18.  Plaintiffs alleged that each Service Defendant has formed an "association-in-fact RICO enterprise consisting of itself and all of the Manning Defendants." *Id.*  Plaintiffs brought causes of action against the Service and Manning Defendants for negligence in creating unsafe work conditions as a result of their hiring practices and violation of the Outer Continental Shelf Lands Act ("OCSLA") 43 U.S.C. § 1331, *et seq.*  *Id.* at 19-20.

Each of the Service and Manning Defendants brought a motion to dismiss Plaintiffs' Third Amended Complaint.  The motions among the Service Defendants were brought by the Offshore Defendants (Dkt. No. 176), the Horizon Defendants (Dkt. No. 174), McDermott (Dkt. No. 178), Stolt (Dkt. No. 180), Helix (Dkt. No. 179), and the Global Defendants (Dkt. No. 177).

The motions among the Manning Defendants were brought by O.W.I. (Dkt. No. 172), Oceanwide Houston (Dkt. No. 173), Oceanwide Offshore (Dkt. No. 167), Humares (Dkt. No. 171), and C-MAR Defendants (Dkt. No. 175).  The Motion to Dismiss brought by the Horizon Defendants simply adopted the arguments of all the Service and Manning Defendants.  Dkt. No. 174 at 1.  The arguments brought by the Manning Defendants were identical except for that of the C-MAR Defendants.  *See* Dkt. No. 167, 171-173, and 175.

The Court held a hearing regarding these motions on November 8, 2006.  Dkt. No. 194.  An issue arose regarding plaintiffs previously employed by Defendant Horizon Offshore, Inc.  Dkt. No. 216 at 1.  In the Third Amended Complaint, each plaintiff sought to "represent a class of persons . . . who were employed by the Service Defendants during the three years prior to the filing of [the] action."  Dkt. No. 66 at 3.  The Court granted leave of Court to amend the complaint to substitute the Estate of Danny Cunningham.  Dkt. No. 217 at 1.  Danny Cunningham was previously employed with Offshore Defendants.  Dkt. No. 66 at 4.  The Court also granted leave to name additional Plaintiffs Ronald Turner, Sr., Brunson Ableson, and Charles Rockward, in place of Bernard Coleman, all of whom worked for the Horizon Defendants.  Dkt. No. 217 at 1-2.  Plaintiffs, all individually, and on behalf of those similarly situated filed a Fourth Amended Complaint against Service Defendants and Manning Defendants.  Fourth Amended Complaint, Dkt. No. 219 at 1-2.  Among the Plaintiffs specifically, Danny Cunningham, as represented by Amy Chatagnier, Pablo Rubio Llamas, and Jacob Van Dyke were previously employed by Offshore Defendants; Ronald Turner, Sr. and Charles Rockward were previously employed by Horizon Defendants; Todd Crews was previously employed by McDermott; Raphael Young was previously employed by Helix; and Wendell Smith was previously employed by Global Defendants.  Dkt. No. 219 ¶¶ 3.3-3.10.  The

only Service Defendant that does not have a representative Plaintiff named in the Fourth

Amended Complaint is Stolt.  *See* Dkt. No. 219.  Moreover, Plaintiffs' RICO claims against Stolt

were already dismissed pursuant to a stipulation of dismissal by the Plaintiffs, leaving only the

claims for negligence and violation of OCSLA.  *See* Dkt. No. 157 and 160.

In light of the amended complaint, all of the Manning Defendants and all of the Service

Defendants, filed motions to dismiss the Fourth Amended Complaint. The Defendants argued

that Plaintiffs' Fourth Amended Complaint does not contain substantive differences from the

Third Amended Complaint.  The primary difference in the complaints was the substitution of

certain named plaintiffs.  Therefore, the Defendants re-urged or incorporated by reference their

prior motions to dismiss the third amended complaint.  In particular, among the Manning

Defendants, Humares, Oceanwide Offshore, O.W.I., and Oceanwide Houston re-urged and

incorporated motions 171, 167, 172, and 173, respectively, as well as their reply to Plaintiffs'

response (Dkt. No. 199).  Dkt. No. 221 at 2.  C-MAR Defendants of the Manning Defendants

also incorporated by reference their previous motion to dismiss (Dkt. No. 175) as well as those of

other Defendants.  Dkt. No. 232 at 2.  In C-MAR Defendants' previous motion to dismiss, C-

MAR Defendants noted in particular that it adopted the Renewed Motion to Dismiss Plaintiff's

Third Amended Complaint by Helix (Dkt. No. 179).  Dkt. No. 175 at 2.  Among the Service

Defendants: Global Defendants (Dkt. No. 220) re-urged their previous motion to dismiss (Dkt.

No. 177), McDermott (Dkt. No. 222) re-urged its previous motion to dismiss (Dkt. No. 178),

Horizon Defendants (Dkt. No. 223) re-urged their previous motion to dismiss (Dkt. No. 174),

Helix (Dkt. No. 224) re-urged its previous motion to dismiss (Dkt. No. 179), and Offshore

Defendants (Dkt. No. 225) re-urged their previous motion to dismiss (Dkt. No. 176).  Also re-

urged were the Defendants' replies, including that of Humares, Oceanwide, O.W.I. and

Oceanwide Houston (Dkt. No. 199), McDermott (Dkt. No. 200), Offshore Defendants (Dkt. No. 201), and Horizon Defendants (Dkt. No. 198).  Only Stolt did not re-urge its previous motion to dismiss (Dkt. No. 180).  Rather, Stolt filed a new Motion to Dismiss Complainants' Fourth Amended Complaint.  Dkt. No. 226.

In response to each of the Service and Manning Defendants' Motions re-urging their prior motions (Dkt. Nos. 220, 221, 222, 223, 224, 225, and 2320, Plaintiffs responded (Dkt. Nos. 227, 228, 229, 230, 237, 231, 236, respectively) by re-urging their prior response (Dkt. No. 193) and sur-reply (Dkt. No. 211).  In response to the Stolt's new Motion to Dismiss (Dkt. No. 226), Plaintiffs argue that the December 4, 2006 Amended Order did not authorize additional motions to dismiss and the new motion had added additional authority.  Dkt. No. 238 at 2.  Plaintiffs state that, "[t]o the extent that Stolt's prior and current Motions to Dismiss are the same, Plaintiffs re-urge the arguments and authorities in its prior response.  To the extent Stolt's Motion is substantively different, Plaintiffs request that it be stricken or otherwise denied." *Id.* at 2 n.2. Plaintiffs argue that allowing Stolt's motion would invite all the other defendants to file new motions and in turn require a new round of briefing and arguments.  *Id.* at 2.  The Court notes that to the extent that it granted Stolt's motion, the Court considered arguments that were raised in Stolt's previous motion.  *See* Dkt. No. 180.

## II.  LEGAL PRINCIPLES

When deciding a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true.  *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004).  The standard under Rule 12(b)(6) used to be that the district court may not dismiss a

complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355

U.S. 41, 45-46 (1957).  However, the Supreme Court recently explained that *Conley* "described

the breadth of opportunity to prove what an adequate complaint claims, not the minimum

standard of adequate pleading to govern a complaint's survival." *Bell Atl. Corp. v. Twombly*, 127

S.Ct. 1955, 1968-69 (2007); *Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal*

*Breaches Litigation)*, 495 F.3d 191, 205 n.10 (5th Cir. 2007).

It is recognized that a motion to dismiss under Rule 12(b)(6) is disfavored and rarely

granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004).  The Supreme Court

stated that a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  The Supreme Court explained

that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his
> "entitlement to relief" requires more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will not do.  Factual allegations
> must be enough to raise a right to relief above the speculative level on the
> assumption that all the allegations in the complaint are true (even if doubtful in
> fact).

*Id.* at 1965 (citations omitted).

"[C]onclusory allegations or legal conclusions masquerading as factual conclusions will

not suffice to prevent a motion to dismiss." *Southern Christian Leadership Conference v.*

*Supreme Ct.*, 252 F.3d 781, 786 (5th Cir. 2001) (quoting *Fernandez-Montes v. Allied Pilots*

*Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).  "[A] complaint . . . must contain either direct or

inferential allegations respecting all the material elements necessary to sustain a recovery under

some viable legal theory." *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1093 (7th

Cir. 1992) (citation omitted).

### III.  DISCUSSION

As explained above, other than the substitution of various Plaintiffs, the substantive

pleadings of the third and fourth amended complaints are identical.  Though the Motions to

Dismiss in this action address the Fourth Amended Complaint, almost all of the motions simply

re-urge or incorporate the prior motions related to the Third Amended Complaint.  For the sake

of clarity, the Court will only reference the Third Amended Complaint rather than redundantly

citing to the Fourth Amended Complaint.  Moreover, as mentioned above, Oceanwide Offshore,

Humares, O.W.I. and Oceanwide Houston of the Manning Defendants share the exact arguments,

therefore, when Oceanwide Offshore's arguments are mentioned, they are identical for the other

Manning Defendants, except for that of the C-MAR Defendants.

### A.      Violations of 18 U.S.C. § 1962(c) of RICO

In the Third Amended Complaint, Plaintiffs allege that the Service Defendants employ

thousands of workers in projects and are the dominant source of demand for the offshore labor

market on the OCS.  Dkt. No. 66 at 14-15.  Plaintiffs allege that the Service Defendants direct the

Manning Defendants to recruit "a largely illegal labor force that will work for depressed wage

rates, significantly below the wages legal workers would demand." *Id.* at 16.  Plaintiffs allege

that the Manning Defendants, in most cases, know that the workers are illegally employed. *Id.* at

16-17.  Plaintiffs state that the Illegal Worker Hiring Scheme has been successful in depressing

wages and that each Plaintiff is a victim. *Id.* at 17.  Specifically, Plaintiff alleges that the Illegal

Worker Harboring Scheme violates 8 U.S.C. § 1324(a)(1)(A)(iii) related to "knowingly

harboring or concealing illegal aliens" and 8 U.S.C. § 1324(a)(3)(A) related to "prohibiting the

knowing employment of illegal aliens." *Id.*  Plaintiffs allege that the violations of RICO are

pursuant to 18 U.S.C. § 1961(1)(F) as committing a "pattern of racketeering activity."  *Id.* at 18.

Plaintiffs allege that "each Service Defendant has formed an association-in-fact RICO enterprise

consisting of itself and all of the Manning Defendants" and that each of the 10 RICO enterprises

"has an existence apart from the commission of the Illegal Worker Hiring Scheme, as all the

members are legitimate businesses."  *Id.*  Plaintiffs allege that the association-in-fact enterprise

has been ongoing for at least three years prior to the filing of the complaint.  *Id.*  Plaintiffs allege

that Service and Manning Defendants are aware that most of the recruited workers are illegal,

"which is essential to the Illegal Worker Hiring Scheme to depress wages," though "some of the

workers recruited workers are legal workers."  *Id.*

> Plaintiffs allege a violation of 18 U.S.C. § 1962(c) of RICO which states:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or collection of unlawful debt.

> As this Court has previously explained, "[t]o state a claim under the RICO statute, 18

U.S.C. § 1962, a plaintiff must allege (1) the conduct (2) of an enterprise (3) through a pattern (4)

of racketeering activity."  *Z-TEL Communs., Inc. v. SBC Communs., Inc.*, 331 F. Supp. 2d 513,

557 (E.D. Tex. 2004) (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989)).  Defendants

attack prongs two and four by arguing that the Plaintiffs have not alleged a proper RICO

enterprise and that there are no RICO predicate acts.   Defendants also argue that Plaintiffs lack

standing under RICO.  As stated above, Plaintiffs allege that the Illegal Worker Harboring

Scheme violates 8 U.S.C. § 1324(a)(1)(A)(iii) and 8 U.S.C. § 1324(a)(3)(A) of the INA.  *See* 18

U.S.C. 1961(f) (defining "racketeering activity" to include "any act which is indictable under the

Immigration and National Act, section 274 [8 U.S.C. § 1324]").  The Parties contest the

applicability of the INA to the OCS.

1.      **Application of INA to the OCS**

a.      **Parties' Positions**

C-MAR Defendants argue that "immigration laws of the United States do not apply to the

OCS."  Dkt. No. 175 at 4 (citing *United Ass'n of Journeymen & Apprentices of the Plumbing &*

*Pipe Fitting Industry v. Reno*, 73 F.3d 1134, 1137 n.2 (D.C. Cir. 1996); *United Ass'n of*

*Journeymen & Apprentices of the Plumbing & Pipe Fitting Industry v. Barr*, 981 F.2d 1269,

1271 n.1 (D.C. Cir. 1992)); *see also* Helix Motion, Dkt. No. 179 at 17; Offshore Defendants'

Motion, Dkt. No. 176 at 13; Stolt's Motion, Dkt. No. 180 at 6.  Global Defendants also argue that

the Department of Justice found that Congress, in enacting the 1978 amendments to OCSLA, did

not intend for the INA to apply to drilling rigs on the OCS.  Dkt. No. 177 at 12 (citing 3 U.S. Op.

Off. Legal Counsel 362, 266, *reprinted at* 1979 WL 16599 (Sept. 21, 1979)).  Offshore

Defendants also assert that the "United States Coast Guard, in enacting regulations required by

OCSLA, reaffirmed the Immigration and Naturalization Service's position that 'the Immigration

and Naturalization Act does not apply on the OCS."  Dkt. No. 176 at 15 (citing 47 Fed. Reg.

9366, 9370-71). McDermott states that the "INA does not apply on the OCS, which is governed

instead by the "manning requirements" of OCSLA, the violation of which is not listed as a

'predicate act' under 18 U.S.C. § 1961(1)(F)."  Dkt. No. 178 at 10; *see also* Helix Motion, Dkt.

No. 179 at 17-19; Offshore Defendants' Motion, Dkt. No. 176 at 16.  McDermott argues that

Plaintiffs must provide more than simply alleging that defendant knowingly hired at least ten

unauthorized aliens in a twelve-month period.  Dkt. No. 178 at 11 (quoting *Systems*

*Management, inc. v. Loiselle*, 91 F. Supp. 2d 401 (D. Mass. 2000)).

Plaintiffs argue that violations of INA are predicate actions under RICO.  Dkt. No. 193 at

44 (citing 18 U.S.C. § 1961(f)).  Plaintiffs state that under Rule 8 pleading standards, the

Complaint need not allege "precisely how [provisions of the INA] are violated." *Id.* Rather, Plaintiffs state that it is a question of fact how the INA was violated. *Id.* Plaintiffs argue that aliens entering the United States to work, must still comply with the INA, even if to work on the OCS. *Id.* at 45. Plaintiffs aver that factual issues regarding the Illegal Worker Hiring Scheme, including misrepresentations to officials, the work the allegedly illegal workers performed, where the work was performed, and for whom, must be resolved. *Id.* at 46.

With regard to OCSLA, Plaintiffs argue that the case cited by Defendants, *Reno*, "actually held the immigration laws do not apply where one proves one's entitlement to the foreign ownership exception to OCSLA's § 1356 manning requirements." *Id.* at 48. Plaintiffs argue that *Reno* held that the INA does not apply "to those who are manning or crewing foreign-owned derrick barges qualifying for the exemption set forth in [OCSLA] § 1356(c)(2)." *Id.* at 40 (citing *Reno*, 73 F.3d at 1140-41). Plaintiffs distinguish *Reno* from the instance case by stating that the issue is open regarding whether "the application of the INA to Defendants' activities where no OCSLA manning exceptions exist." *Id.* at 49. Plaintiffs argue that whether Defendants have valid OCSLA exemptions is an issue of fact. *Id.* at 50. Plaintiffs concede that if Defendants do not have valid exemptions, "then the question of INA applicability to their activities is ripe for decision." *Id.* at 51.

Offshore Defendants reply that the "conclusions of the Attorney General and the D.C. Circuit in *Reno* are supported by the House of Representatives' recent passage of the Deep Ocean Energy Resources Act" which would "amend Section 30(a) of OCSLA (43 U.S.C. 1356(a)) to state that the manning regulations 'shall be supplemental and complimentary with and under no circumstances a substitution for the provisions of the Constitution and laws of the United States extended to the subsoil and seabed of the Outer Continental Shelf pursuant to section 4(a)(1) of

this Act." Dkt. No. 201 at 3.  Offshore Defendants assert that this amendment is a "clear acknowledgment by Congress that the INA does not currently apply to the OCS." Dkt. No. 201 at 3.  Offshore Defendants state that Plaintiffs attempt to circumvent OCSLA's preemption of the INA in the OCS by arguing that the workers "must still enter the United States in compliance with the law." Dkt. No. 201 at 4.  Offshore Defendants argue that this case is about the Service Defendants "harboring" illegal workers by employing them on the OCS and knowingly employing illegal workers on the OCS; therefore, Offshore Defendants conclude the "alleged INA violations occur only after employment on the OCS." Dkt. No. 201 at 4-5.

Plaintiffs reply that "Defendants seek to have a complex, fact-driven analysis performed on no record." Dkt. No. 211 at 3.  Plaintiffs state that "entry is not an 'element' of Plaintiffs' cause of action that must be pled; it is an element of Plaintiffs' RICO predicate claims under the INA that are properly pled." *Id.*   Plaintiffs argue that they are not "repleading their Complaint, but merely identifying one set of facts which may be proven consistent with the allegations made." *Id.*

## b.     Analysis

Plaintiffs argue that *Reno* narrowly held that the "immigration laws do not apply where one proves one's entitlement to the foreign ownership exception to OCSLA's § 1356 manning requirements." Dkt. No. 193 at 48.  Many of the Defendants, on the other hand, argue that *Reno* stands for the proposition that the INA does not apply to the OCS.  *Reno* had been decided after remand pursuant to *Barr*.

The Outer Continental Shelf Lands Act of 1953 (OCSLA), ch. 345, 67 Stat. 462 codified as amended, 43 U.S.C. § 1331 *et seq*.), along with the 1978 Amendment, extended the Constitution to "all artificial islands, and all installations and other devices permanently or

temporarily attached to the seabed." *See Reno*, 73 F.3d 1134 at 1135 (citing 43 U.S.C. § 1333(a)(1)).

Four cases have attempted to resolve the conflict between the application of the INA to the OCS and the potential conflict with OCSLA.  A case in the Ninth Circuit and a line of three cases in the DC Circuit were related to foreign owned vessels that fell under the exception of 43 U.S.C. § 1356(c)(2) but had alien crews which were questionably subject to the INA.  Those Courts had to determine, in light of the exemption, whether the provisions of INA still applied to the crew members of those vessels.

In *Piledriver's Local Union No. 2375 v. Smith*, 695 F.2d 390, 393 (9th Cir. 1982), the Ninth Circuit found that:

> the worker certification requirements of the I.N.A. are virtually the same as the manning requirements of section 1356(a)(3), and since the I.N.A. is applicable to the outer continental shelf, it is highly unlikely that Congress intended to delay implementing those exceptions.  We, therefore, hold that the exceptions to the manning requirements as set forth in 43 U.S.C. § 1356 are now in effect and the INS is bound by them.

Subsequently, the District Court for the District of Columbia in *United Association of Journeymen v. Thornburgh*, 768 F. Supp. 375, 379 (D.D.C. 1991) declined to follow *Piledrivers'*.  The *Thornburgh* Court also disagreed with the Office of Legal Counsel's conclusion that § 1356 of OCSLA precludes application of the INA on the OCS.  *Id.* at 379 & 381.

Thereafter, in *Barr*, the DC Circuit determined that the 1978 Amendment adding § 1356, the manning requirements of OCSLA, also provided exceptions for these requirements.  981 F.2d 1269.  Specifically, 43 U.S.C. § 1356(a)(3) requires "any vessel, rig, platform, or other vehicle or structure . . . be manned or crewed, except as provided in subsection (c), by citizens of the United States or aliens lawfully admitted to the united states for permanent residence."  Subsection

(c)(2) provides an exception for any vessel or structure "over 50 percent of which is owned by citizens of a foreign nation or with respect to which the citizens of a foreign nation have the right effectively to control."  The *Barr* Court noted that "§ 1356 was intended to 'reconcile the dual concerns of providing the fullest possible employment for Americans in U.S. Outer Continental Shelf activities and eliminating to the fullest possible extent the likelihood of retaliation by foreign nations against American workers in foreign offshore activities.'" *Barr*, 981 F.2d at 1273 (quoting H.R. REP. NO. 1474, 95th Cong., 2d Sess. 123 (1978)).  Because the vessel in *Barr* fell under a § 1356(c)(2) exception, the *Barr* Court determined it need only decide "whether aliens manning or crewing foreign-owned facilities, . . . , were exempted from the immigration laws even if these laws otherwise applied."  The *Barr* Court recognized the factual nature of the inquiry and stated that it could not determine the applicability of § 1356 without understanding, for example, "how platforms are erected," "the extent to which workers move back and forth from the ship to the structure while they are installing a jacket," or "whether workers who are constructing and installing an offshore platform are technically 'manning or crewing' the platform rather than the construction barge, for the purpose of § 1356." *Barr*, 981 F.2d at 1274. The *Barr* Court concluded that "the broad question of whether the Immigration and National Act generally applies on the outer Continental Shelf should not be decided while § 1356's applicability remains unresolved." *Id.* at 1275.

With a more complete factual record, the Court in *Reno* first affirmed the district court's reasoning that during the installation of oil platforms those aliens that were on the derrick barge were "manning and crewing the barge rather than the oil platform." *Reno*, 73 F.3d at 1137.  The *Reno* Court agreed that the Coast Guard's regulations determined that the "'regular complement of the unit' means those personnel necessary for the routine functioning of the unit . . . [and]

construction workers on derrick barges 'are engaged in the business of the vessel, which is

constructing offshore platforms.'" *Id.*   Thus, the narrow issue determined by the *Reno* Court was

"although foreign-owned derrick barges and their workforces operating on the outer Continental

Shelf fit within the exception of § 1356(c)(2), and do not have to be manned or crewed by

American citizens or resident aliens, must the aliens working on them nevertheless comply with

the strict requirements of the Immigration and Nationality Act?"  *Id.*

In *Reno*, the unions argued that the foreign ownership provision of 43 U.S.C. §

13569(c)(2) "is not framed as an exception to the extension of federal laws (including the

immigration laws) to the outer Continental Shelf," but rather an exemption from the

requirements of § 1356(a)(3).  *Id.* at 1138.  The unions therefore argued that while a vessel "may

thereby escape the manning and crewing strictures of § 1356(a)(3), . . . its crew members would

remain subject to the Immigration and Nationality Act, about which § 1356 is silent."  *Id.*

Rejecting this argument, the *Reno* Court noted that the Justice Department, at the request of the

Immigration and Naturalization Service, had concluded "that § 1356 is 'a self-contained

statement of the extent to which principles of immigration control are to be applied': if the crew

of a foreign-owned vessel or structure need not consist of citizens or resident aliens, the

Immigration and Nationality Act imposes no further restrictions."  *Id.* at 1139 (citing 3 Op. Off.

Legal Counsel at 366).

The *Reno* Court noted that, had the INA applied, then the exceptions would be

nonsensical because even if an exemption applied under § 1356(c)(2), the Immigration and

Nationality Act "would have forced the foreign owners to employ American crews on their

vessels and structures."  *See Reno*, 73 F.3d at 1139.  The *Reno* Court thus determined that "the

Immigration and Nationality Act does not apply to those who are manning or crewing foreign-

owned derrick barges qualifying for the exemption set forth in § 1356(c)(2)." *Id.* at 1140-41.

Judge Edwards, dissenting in *Reno,* further clarified the majority's holding as: "foreign workers who are on the OCS to construct a domestically-owned oil platform are nonetheless exempt from United States immigration restrictions if, under a Coast Guard regulation, they are found to 'man or crew' a foreign-owned vessel that provides them temporary quarters while they complete the construction project." *Id.* at 1141.  Judge Edwards noted that it is "undisputed that section 1333 of OCSLA explicitly applies all United States law, including the INA, to the OCS." *Id.* at 1142.  Judge Edwards determines that the majority opening has turned section 1356 of OCSLA into an "enormous loophole by which United States corporations can employ foreign workers despite the ready availability of domestic labor." *Id.* at 1141.  Judge Edwards further provides examples showing how section 1356 applies and the INA does not, thus acting as a supplement to INA rather than a replacement. *Id.* at 1143.  As Judge Edwards recognizes, section 1356 refers to fixed structures as well as free-floating vessels. *Id.* at 1143.  Both the Attorney General and the dissent have unquestionably decided that the INA applies to fixed structures of the OCS.  Judge Edwards determines that the majority's opinion now allows "[d]omestic corporations wishing to construct oil platforms [to] . . . entirely avoid the labor-protecting provisions of the INA simply by using foreign-owned derrick barges to shelter the workers while they sleep." *Id.* at 1145.

Here, like the DC Circuit in *Barr*, this Court is left with insufficient factual information to make a determination of whether the vessels of the Defendants were subject to the INA or whether the manning requirements or exemptions of OCSLA apply.  The Court starts with the general uncontested holding that the INA applies to the OCS and attachments to the OCS, such as the oil platforms.  1 INS and DOJ Legal Opinions § 93-82 (Oct. 13, 1993).  The uncharted

territory of law, at least with regard to the Fifth Circuit, is related to the vessels servicing those platforms.  This Court need not determine whether to adopt the reasoning of the dissent or the majority of *Reno.*  The complaint reads that the Defendants were involved in various projects but there is no information in how long the projects ran, how the workers were utilized, the movement of aliens between vessels and the oil platforms, etc.  Therefore, this Court cannot yet make a determination of whether the aliens would be considered the crew of the vessels or whether they would be considered as members of the platforms' regular complement.  A factual determination would need to be made regarding each type of project and whether OCSLA exemptions applied.

In addition, the Plaintiffs' have provided another plausible scenario that would be outside the scope of *Reno*, where "OCS operations are allegedly taken place ostensibly within OCSLA's § 1356 foreign ownership or control exemptions, but where in fact the operations are being conducted, directed, staffed, and otherwise controlled by American companies."  Dkt. No. 193 at 51 (emphasis in original).  A "dismissal for failure to state a claim does not require the appearance that, beyond a doubt, the plaintiff can prove ***no set of facts*** in support of his claim that would entitle him to relief.  Rather, to survive a 12(b)(6) motion to dismiss, a plaintiff must show, after adequately stating his claim, that it may be supported by some set of facts consistent with the allegations in the complaint."  *Mugworld, Inc. v. G.G. Marck & Assocs.*, 2007 U.S. Dist. LEXIS 66230, at *6 (E.D. Tex. Aug. 23, 2007) (emphasis in original).   The Plaintiffs have adequately stated their claim with regard to the application of the INA to the OCS and scenarios related to exemptions of the OCSLA manning requirements.  Therefore, this Court will allow discovery in order to develop the record.  If during discovery, the Defendants provide a record that indicates that the workers would not be considered as manning the platforms of the OCS or

would fall under an  OCSLA exemption, then the Defendants may renew their motion to dismiss.

The Court declines to determine whether the INA applies to the potential loophole created by *Reno* or whether that loophole applies in this Circuit.  A factual determination must be made regarding the type of projects and the manning of vessels as pertains to the Projects of the Defendants.  Until such a factual determination is made, the issue of the application of the INA to the OCS and the OCSLA exemption is not ripe before this Court.

**2.     8 U.S.C. § 1324(a)(1)(A)(iii) and 8 U.S.C. § 1324(a)(3)(A)**

**a.     Parties' Positions**

Global Defendants argue that Plaintiffs do not sufficiently plead either violation, 8 U.S.C. § 1324(a)(1)(A)(iii) and 8 U.S.C. § 1324(a)(3)(A), under the INA because Plaintiffs have not alleged "that any Defendant knowingly hired at least 10 alien workers in a 12-month period or that Defendants had any knowledge of how the workers were brought into the United States or the purpose for which they entered the United States" or "that Defendants concealed, harbored, or shielded an alien from detection while knowing . . . that the alien illegally came to, entered, or remains in this country."  Dkt. No. 177 at 5; *see also* Dkt. No. 180 at 9.  Stolt cites to *System Management, Inc. v. Loiselle*, 91 F. Supp. 2d 401, 408 (D. Mass. 2000) for the proposition that the plaintiff must "demonstrate any factual allegations with respect to how the aliens entered the country and that the defendants had knowledge of the purpose for which the aliens entered." Dkt. No. 180 at 10.  Stolt continues that the allegation that Service Defendants harbored illegal workers through an alleged relationship with a Manning Defendant or by having the workers perform work on vessels does not constitute "harboring" or "knowing" employment.  *Id.* at 11. Stolt further argues that Plaintiffs do not explain how the transfer of "actual employment" occurs. *Id.*  Global Defendants states that the Fifth Circuit "requires that Plaintiffs plead more than the

conclusory statement that the INA has been violated" citing to a Fifth Circuit case requiring more than mere allegations in the context of antitrust claims.  Dkt. No. 177 at 5 n.3 (citing *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979)).  Global Defendants note that there is no INA criminal provision to become a worker on an OCS rig.  *Id.* at 6. McDermott also argues that Plaintiffs try to recast 8 U.S.C. § 1324(a)(1)(A)(iii) as a violation for "entry," but the Third Amended Complaint does not discuss "entry" and "illegal entry" alone is not a violation of this section.  Dkt. No. 200 at 7.  McDermott asserts that the Complaint only alleges that the Service Defendants harbored illegal workers by employing them on the OCS, but no other geographic location is specified.  Dkt. No. 200 at 8 (citing Complaint, Dkt. No. 66 ¶ 4.19).

Plaintiffs rebut Stolt's arguments that specific factual allegations must be made.  Dkt. No. 193 at 24.  Plaintiffs argue that the case cited by Stolt was entered before *Mendoza*, *Williams*, and *Swierkiewicz v. Sorema N.A.*, 503 U.S. 506 (2002), which did not require specific fact pleading. *Id.*  Plaintiffs also rebut Stolt's assertion that employing illegal immigrants does not constitute "harboring" pursuant to 8 U.S.C. § 1324(a)(1)(A)(iii).  *Id.* at 25-26 (citing 3C Am Jur. 2d Aliens and Citizens § 2611 (2005); *United States v. Cantu*, 557 F.2d 1173, 1177 (5th Cir. 1977); *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1072 (5th Cir. 1982)).

Global Defendants note that "both INA provisions also require that the aliens at issue have illegally entered the country, a requirement unsupported by (and wholly absent from) the Complaint."  Dkt. No. 198 at 3.  Global Defendants argue that Plaintiffs hypothesize "how there could have been undocumented aliens entering the United States with an ultimate OCS destination or undescribed misrepresentations of undescribed information to government officials."  *Id.* at 4 (citing Plaintiffs' Response, Dkt. No. 193 at 44-47).  Global Defendants argue

19

that these hypothetical scenarios are not in the Complaint and "Plaintiffs cannot amend their

Complaint with hypotheticals in a brief." *Id.* at 4-5.  Global Defendants argue that if the INA

does not apply to the OCS, as Plaintiffs contend, then Plaintiffs "cannot meet the direct injury

requirement of *Anza*" because Plaintiffs have tied illegal entry to the "only alleged injury – the

lowering of wages for all workers *on the OCS*."  Dkt. No. 198 (emphasis in original).

      **b.**        **Analysis**

Plaintiffs specifically allege that the "Illegal Worker Hiring Scheme violates two

provisions of Section 274 of the Immigration and Nationality Act":  8 U.S.C. § 1324(a)(1)(A)(iii)

and 8 U.S.C. § 1324(a)(3)(A).  Plaintiffs argue that even if the INA does not apply to the OCS,

the INA applies to entry into the United States and entering "in violation of law" is an element of

8 U.S.C. § 1324(a)(1)(A)(iii).  Dkt. No. 193 at 45.  As explained earlier, this Court has declined

to make the determination of the exemptions that would apply as it requires a factual analysis.

Defendants cite to *System Management, Inc. v. Loiselle*, 91 F. Supp. 2d 401, 408 (D.

Mass. 2000) for the proposition that the plaintiff must demonstrate factual allegations with

respect to how the aliens entered the country and that the defendants had knowledge of the

purpose for which the aliens entered.  However, multiple courts have explicitly rejected a

heightened pleading requirement and instead held that more liberal pleading requirements of Fed.

R. Civ. P. 8 apply to "a RICO action involving non-fraud, immigration offenses as predicate

activities, and not heightened pleading requirements of Rule 9(b)."  *Trollinger v. Tyson Foods,*

*Inc.*, 2007 U.S. Dist. LEXIS 38882, at *18 (E.D. Tenn. May 29, 2007) (citing *Williams v.*

*Mohawk Indus., Inc.*, 314 F. Supp. 2d 1333 (N.D. Ga. 2004)).  As noted by the Court in

*Trollinger*, RICO actions are not included in Rule 9 as an action requiring a heightened pleading.

*Id.* at *20.

Addressing 8 U.S.C. § 1324(a)(1)(A), the *Trollinger* Court stated that "for a plaintiff to plead a violation of the statute prohibiting employment of unauthorized aliens, as a predicate act in a RICO case, the plaintiff must simply allege that the aliens were brought into the United States for the purpose of illegal employment, but there is no requirement that the employer must have brought the aliens into this country."  2007 U.S. Dist. LEXIS 38882, at *22-*23 (citing *Mohawk Industries, Inc.*, 314 F. Supp. 2d at 1346)).  The *Trollinger* Court explained that:

> the Court will examine the Complaint to see if it contains allegations, either direct or inferential, that indicates a subjective belief on the part of Defendants it employed illegal aliens that had been brought into the United States illegally. The Court must consider the Complaint as a whole and not limit itself to isolated portions of the Complaint, and the Court must endeavor to give meaning to every word of the Complaint. The Court conducts this examination in the context of the commonly understood problem with illegal immigration in the country.

*Id.* at *25.

Here, Plaintiffs' Complaint regarding the Illegal Worker Hiring Scheme alleges that the "Service Defendants have 'harbored' hundreds, if not thousands, of illegal workers by employing them on the OCS.  This employment, knowing the workers are illegally employed on the OCS, also constitute their 'knowing' employment."  Dkt. No. 66 ¶ 4.19.  In *Williams v. Mohawk Industries*, with a complaint similar to the one in this case, the Eleventh Circuit determined that "[a]ccording to the plaintiff's complaint, Mohawk has committed hundreds, even thousands, of violations of federal immigration laws.  Consequently, we conclude that the plaintiffs have properly alleged a 'pattern of racketeering activity.'" 465 F.3d at 1283.

As explained earlier, the Supreme Court requires that a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. at 1974.  Construing the facts in the light most favorable to Plaintiffs, the Court determines that the INA violations have been sufficiently plead.

### 3.      Cause of Action Against Service Defendants Only

#### a.      Parties' Positions

In the Third Amended Complaint the first cause of action was alleged violations of RICO brought "Against the Service Defendants Only."  Dkt. No. 66 at 13.  Oceanwide Offshore argues that Plaintiffs exclude Oceanwide Offshore from the RICO claim because the Plaintiffs state that this cause of action is only against the Service Defendants.  Dkt. No. 167 at 4.  Oceanwide Offshore concludes that the RICO action should be dismissed as to Oceanwide Offshore.  *Id.*; Dkt. No. 199 at 2.  McDermott notes that the allegations "do not assert that the Manning Defendants are part of the Illegal Worker Hiring Scheme, which is limited to the Service Defendants."  Dkt. No. 178 at 13.  McDermott argues that there cannot be a RICO enterprise without participation.  *Id.* at 14 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 180 (1993)).

Plaintiffs reply that the Complaint alleged that the Manning Defendants have recruited illegal workers for the Service Defendants, and that the Service Defendants have formed an association-in-fact enterprise with the Manning Defendants.  Dkt. No. 211 at 7 (citing Dkt. No. 66 ¶ 4.23).

#### b.      Analysis

Plaintiffs bring their RICO action under 18 U.S.C. § 1962(c) which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

As the Fifth Circuit recently explained, "[t]o state a claim under subsection (c), a plaintiff *must* demonstrate, *inter alia*, that the RICO person is distinct from the RICO enterprise." *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007) (citing *Crowe v. Henry*, 43 F.3d 198, 205-06 (5th Cir. 1995); *Whelan v. Winchester Prod. Co.*, 319 F.3d 224, 229 (5th Cir. 2003)).

"Although a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise.  In such a case, the individual defendant is distinct from the organizational entity."  *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) (citing *United States v. Fairchild*, 189 F.3d 769, 777 (8th Cir. 1999)).  Here, the "persons" are each of the Service Defendants.  As explained by the Plaintiff, all of the Manning Defendants are in an association-in-fact through their relationship in staffing the projects of each of the Service Defendants.  Dkt. No. 66 ¶¶ 4.23-4.24.  Therefore, the Plaintiffs properly allege that an association-in-fact enterprise was formed between the Service Defendants and Manning Defendants.

### 4.      Enterprise

#### a.      Parties' Positions

C-MAR Defendants argue that "to establish a RICO enterprise, Plaintiffs are required to allege a decision making structure for the RICO enterprise and a purpose of the RICO enterprise independent of the alleged predicate acts."  Dkt. No. 175 at 5 (citing *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 440-41 (5th Cir. 1987); *Old Time Enterprises, Inc. v. International Coffee Corp.*, 862 F.2d 1213, 1218 (5th Cir. 1989)); *see also* Helix Motion, Dkt. No. 179 at 15.  Global Defendants add that the Fifth Circuit requires that a plaintiff must plead specific facts to establish the existence of an enterprise.  Dkt. No. 177 at 6 (quoting *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989); citing *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988); *Skidmore Energy, Inc. v. KPMG*, No. Civ. A. 3:03-CV-2138-B, 2004 WL 3019097, at *9-10 (N.D. Tex. Dec. 28, 2004)); *see also* Helix Motion, Dkt. No. 179 at 15 (citing *Montesano v. Seafirst Comm. Corp.*, 818 F.2d 423, 427 (5th Cir. 1987)); Offshore Defendants' Motion, Dkt. No. 176 at 16.  McDermott asserts that the Plaintiff must provide facts indicating "when and

where [the enterprise] was formed, who was in it at any given time, what is its structure, how it was implemented, how it is controlled, and how decisions are made."  Dkt. No. 178 at 12; *see also* Offshore Defendants' Motion, Dkt. No. 176 at 19.  Helix argues that *Elliott v. Foufas* held that the standing order highlighted the particular pleading requirements of RICO, not merely that it was interpreting a district court's standing order.  Dkt. No. 179 at 21.  Helix further argues that the Plaintiff cites to *United States v. Williams* as conflicting with *Elliott v. Foufas*, but Helix asserts that the *Williams* decision "has no bearing on the pleading burden addressed in *Elliott v. Foufas*."  Dkt. No. 179 at 21.

C-MAR Defendants also aver that an essential element of a RICO claim is describing the enterprise through a "hierarchical or consensual decision-making structure."  Dkt. No. 175 at 5 (quoting *Elliott v. Foufas*, 867 F.2d at 881); *see also* Helix Motion, Dkt. No. 179 at 27.  Global Defendants similarly state that, in order to state a claim involving an association-in-fact enterprise, the Fifth Circuit requires that Plaintiffs plead "'an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure' and 'specific facts which establish that the association exists for purposes other than simply to commit the predicate acts.'" Dkt. No. 177 at 7 (quoting *Whelan*, 319 F.3d at 229; citing *Elliott v. Foufas*, 867 F.2d at 881; *Delta Truck & Tractor, Inc.*, 855 F.2d 241, 243-44 (5th Cir. 1988); *Jacobs v. Port Neches Police Dep't*, No. 1:94-CV-767, 1996 WL 363023, at *12 (E.D. Tex. June 26, 1996); *Walsh v. America's Tele-Network Corp.*, 195 F. Supp. 2d 840, 848 (E.D. Tex. 2002)); *see also* Offshore Defendants' Motion, Dkt. No. 176 at 22. Global Defendants cite to *Clark v. National Equities Holdings, Inc.*, No. 4:05-CV-290, 2006 WL 335577, at *6 (E.D. Tex. Feb. 13, 2006) where a RICO claim was dismissed where "Plaintiff failed to allege that the enterprise's members functioned as a continuing unit or that the

enterprise operates with a unified decision-making structure." *Id.* at 8 n.13.  McDermott also notes that there is no allegation of its "management" of the enterprise and "mere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise."  Dkt. No. 178 at 17-18 (citing *Goren v. New Vision International, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998)).

C-MAR Defendants also argue that the alleged purpose of the RICO enterprise is the purpose of the business of the Defendants.  Dkt. No. 175 at 5 (citing *Baker v. IBP, Inc.*, 357 F.3d 685, 691-92 (7th Cir. 2004)); *see also* Helix Motion, Dkt. No. 179 at 24-25.  Global Defendants also believe that the alleged purpose of the enterprise "is just another way of saying that Global was hiring workers in the ordinary course of business."  Dkt. No. 177 at 8.  McDermott argues that the pleadings fail to specify a purpose other than the predicate acts other than merely stating that the "RICO enterprises [have] an existence apart from the commission of the Illegal Worker Hiring Scheme, as all the members are legitimate businesses."  Dkt. No. 178 at 14 (citing Dkt. No. 66 ¶ 4.24; *Whelan*, 319 F.3d at 229).  Offshore Defendants state that the enterprise "must exist as a legitimate business independent of the alleged pattern of racketeering activity."  Dkt. No. 176 at 17.   Helix argues that "[b]ecause this purpose [to hire illegal workers] is not independent of the alleged predicate acts, it cannot be the basis for establishing a RICO enterprise."  Dkt. No. 179 at 23 (citing *Tarter v. United Wis. Life Ins. Co.*, No. 01-2627, 2002 U.S. Dist. LEXIS 11987, at *21-22 (E.D. La. June 25, 2002)).  Helix also argues that the broad purpose of filling staffing needs as different from the normal affairs of Helix fails because "all of the defendants are independently conducting business 'for the purpose of accumulating monetary profit.'" Dkt. No. 179 at 23.  Helix provides that the Fifth Circuit has held that "a § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal

affairs of a defendant corporation." *Id.* (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d at 447 n.16).  Offshore Defendants state that the "only purposes allegedly bringing [Offshore Defendants] and the Manning Defendants together . . . were either their independent business needs or their alleged joint scheme to recruit and employ unlawful workers in the OCS."  Dkt. No. 176 at 21.

Global Defendants also argue that there must be a "common purpose" among alleged enterprise members.  Dkt. No. 177 at 8 (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Global Defendants argue that Service Defendants have an interest in controlling labor costs, while Manning Defendants have an interest in increasing compensation.  *Id.* at 8-9.  In concurrence, McDermott states that "[w]here there are such divergent goals, there is no 'common purpose' in a RICO sense."  Dkt. No. 178 at 16.  McDermott indicates that Manning Defendants do not have a "common purpose" with the Service Defendants as they did not participate in the Illegal Worker Hiring Scheme.  *Id.* at 15.

Plaintiffs argue that there have been ten separate association-in-fact RICO enterprises for each Service Defendant with all the Manning Defendants for at least three years.  Dkt. No. 193 at 15 (citing Dkt. No. 66 ¶ 4.23).  Plaintiffs aver that though the Service Defendants and Manning Defendants are "legitimate businesses," the purpose of the association of each Service Defendants with all the Manning Defendants is to perpetrate the Illegal Worker Hiring Scheme. *Id.* at 16.  Plaintiffs state that the Fifth Circuit has rejected a stringent criteria for a RICO enterprise, rather only requiring the association has a "common purpose," which can be nothing more than "the desire to make money."  *Id.* (citing *United States v. Williams*, 809 F.2d 1072, 1093-94 (5th Cir. 1987) & *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978)).

Plaintiffs state that pleading a RICO enterprise does not entail a higher standard than Rule

8 requires and distinguishes *Elliott v. Foufas* as applying an Eastern District of Louisiana Standing Order that required fact pleading.  Dkt. No. 193 at 17.  Plaintiffs argue that the Standing Order, not Rule 8, required fact pleading, and urges the Court to adopt its position in *Z-TEL Communications*, which only required relatively few allegations.  Dkt. No. 193 at 17 (citing *Z-TEL Communs.*, 331 F. Supp. 2d at 560).   Plaintiffs further provide that they have supplied all of the relevant facts, "*i.e.*, the members of the enterprise, its purposes, the duration of its existence, and how the members interact with each other," and without discovery, the Plaintiffs would have an "insurmountable burden" as "RICO enterprises are, by their nature, hidden."  *Id.* (citing Complaint, Dkt. No. 66 ¶ 4.23-4.24 & *United States v. Elliott*, 571 F.2d at 898).

Plaintiffs state that the Complaint "alleges the enterprise have [sic] both legal and illegal purposes."  Dkt. No. 193 at 18.  Plaintiffs state that the Fifth Circuit has "expressly held that a RICO enterprise *need not* exist for any legitimate purpose." *Id.* (emphasis in original) (citing *United States v. Williams*, 809 F.2d at 1093-94 & *United States v. Diecidue*, 603 F.2d 535, 545 (5th Cir. 1979)).  Plaintiff states that the case cited by Helix, *Tarter v. United Wisconsin Life Ins. Co.*, "makes the critical distinction between an association for purely illicit purposes and one for both legitimate and illicit purposes," in that no RICO enterprise exists where "the only purpose of the enterprise and its sole activity is identical to the alleged racketeering activities."  Dkt. No. 193 at 19 (quoting *Tarter*, 2002 WL 1379168 at *8).  The Plaintiffs submit that the Complaint "alleges that each defendant is a legitimate business operating for profit" which "will suffice to establish the 'legitimate activity.'" *Id.* at 19-20 (citing *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995)).

Plaintiffs also state that Helix and Offshore Defendants incorrectly assert that association-in-fact enterprises must have "structure."  Dkt. No. 193 at 19.  Plaintiffs argue that this

proposition was rejected by the Fifth Circuit in *Williams*, 809 F.2d at 1093-94, that the

Defendants do not clarify what a "structure" is, and the requirement would "impose a heightened

pleading restriction in direct contravention of Rule 8." *Id.*  Plaintiffs aver that they do not have

evidence of a "hierarchy" or "consensual decision making" because they have not received the

evidence; however, they believe the Illegal Worker Hiring Scheme "puts the Defendants and the

Court on notice of the workings of the enterprises." *Id.* at 20.  Plaintiffs allege that the Service

Defendants "delegate the authority of hiring workers to the Manning Defendants," and the

"mostly illegal workers" were then hired by the Service Defendants.  Dkt. No. 193 at 20.

Plaintiff also rebuts the Defendants' argument that Complaint "effectively alleges that

[the Service Defendants] are not distinct from the enterprises." *Id.* at 21.  Plaintiff states that the

Complaint, on its face, provides the legal distinctness between each person and each enterprise.

*Id.* (citing *Cedrick Kushner Promotions v. Don King*, 533 U.S. 158 U.S. 158, 163 (2001)).  In

response to Cal Dive (i.e. Helix), Plaintiffs agrees that the Fifth Circuit "rejects enterprises

consisting of business and their own employees because they are not 'distinct' from the RICO

defendant itself." *Id.* (citing *Old Time Enter.*, 862 F.2d at 1217).  Plaintiffs distinguish their

Complaint from *Atkinson* cited by Helix because the Complaint "alleges an enterprise consisting

of [Helix] and unaffiliated entities, the Manning Companies." *Id.* at 22.  Plaintiffs argue that "a

corporate group of affiliated entities" may be named as a RICO enterprise "when the members

have distinct roles in the alleged racketeering activity." *Id.* (citing *Office Outfitters, Inc. v. A.B.*

*Dick Co.*, 83 F. Supp. 2d 772, 779-80 (E.D. Tex. 2000)).

Regarding a common purpose, Plaintiffs rebut Offshore Defendants' and Helix's

argument that the Manning Defendants and Service Defendants must have a common purpose.

*Id.* at 23.  Plaintiffs argue that both the Fifth Circuit holding in *United States v. Elliot*, 571 F.2d

28

880, 898 (5th Cir. 1978) and the prior Seventh Circuit decision in *United States v. Rogers*, 89

F.3d 1326, 1337 (7th Cir. 1996) are inconsistent with the Seventh Circuit authority, *Baker v.*

*V.I.B.P., Inc.*, 357 F.3d at 691, cited by Defendants.  *Id.* at 23; *Id.* at 23 n.17.

Offshore Defendants reply that the Plaintiffs must "demonstrate that each defendant, each

RICO 'person,' conducted or participated in the alleged enterprises' affairs rather than its own

affairs."  Dkt. No. 201 at 7 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163

(2001)).  Offshore Defendants cite to *Rivera v. AT&T Corp.*, 141 F. Supp. 2d 719, 726 (S.D. Tex.

2001) where the District Court "dismissed the plaintiffs' complaint because the predicate acts

alleged (illegal debt collection practices) were conducted in the course and scope of the

individual defendants' businesses rather than through a RICO enterprise."  *Id.*

Global Defendants note that *United States v. Williams*, "cited by Plaintiffs to dispute this

requirement [of an association-in-fact enterprise], not only preceded other Fifth Circuit cases

finding these three requirements [of an ongoing organization, formal or informal, that functions

as a continuing unit over time through a hierarchical or consensual decision-making structure], it

did not reject these elements, holding only that it was not error to omit them in a criminal jury

instruction."  Dkt. No. 198 at 6 (emphasis in original) (citing *Williams*, 809 F.2d at 1093-94).

McDermott argues that Plaintiffs misconstrue the "common purpose" requirement and the

cases cited by Plaintiffs, *Elliott* and *Williams*, still require a "common purpose."  Dkt. No. 200 at

3.

Plaintiffs respond that the *Rivera* analysis of the scope of authority test was rejected by

*Cedric Kushner*.  Dkt. No. 211 at 7 (citing *Cedric Kushner*, 533 U.S. at 166).  Plaintiffs also cite

to *Office Outfitters* for the proposition that "the allegation that the person and the enterprise had

'distinct roles' the [sic] racketeering activity is sufficient to withstand a Motion to Dismiss

premised on the distinctness between them." *Id.* at 8 (citing *Office Outfitters*, 83 F. Supp. 2d at 779-80). Plaintiffs respond to McDermott's argument and states that each RICO enterprise has a common purpose of "Staffing the Projects." Dkt. No. 211 at 6. Plaintiffs also argue that a common purpose "need be nothing more than 'the desire to make money.'" *Id.* (quoting *United States v. Elliott*, 571 F.2d at 898).

### b.   Analysis

The Fifth Circuit articulated the standard to plead an enterprise under RICO. *Elliott v. Foufas*, 867 F.2d 877 (5th Cir. 1989). An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Fifth Circuit requires that "[i]n order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise." *Elliott v. Foufas*, 867 F.3d at 881.

The Fifth Circuit has articulated that to "establish an 'association in fact' enterprise under 18 U.S.C. § 1961(4) plaintiffs must show 'evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit.'" *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 44-41 (5th Cir. 1987), *cert. denied*, 483 U.S. 1032 (1987) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The Supreme Court in *Turkette* stated that the "enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583. The Fifth Circuit has enumerated the requirements of an enterprise as requiring that it "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit shown by a hierarchical or

consensual decision making structure." *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 433

(5th Cir. 1990).  The Eleventh Circuit states a similar rule, stating that "the existence of an

enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence

that the various associates function as a continuing unit." *Williams v. Mohawk*, 465 F.3d 1277,

1284 (11th Cir. 2006) (citing *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1275 (11th

Cir. 2000)).

Here, the enterprise pled by Plaintiffs are 10 separate associations-in-fact RICO enterprises

between each Service Defendant and all the Manning Defendants.  The Complaint generally alleges

that:

> each of the Service Defendants has been closely engaged with each of the Manning
> Defendants for at least three years before the filing of this complaint.  Accordingly,
> each Service Defendant has its own long-standing relationship with the Manning
> Defendants for the purpose of staffing its projects.  Each Service Defendant obtains
> workers from each Manning Defendant on an ongoing basis.  Over time, each
> Service Defendant has regularized its manner of dealing with the Manning
> Defendants to the point where they work closely together to fill the staffing needs of
> each Service Defendant.  When a worker is recruited by one of the Manning
> Defendants, that worker then becomes actually employed by the Service Defendant,
> and the Service Defendant then pays a fee to the Manning Defendant.  Most of these
> recruited workers are illegal workers, which the Manning Defendants and the
> Service Defendants know, and which is essential to the Illegal Worker Hiring
> Scheme to depress wages.

Dkt. No. 66 ¶ 4.23.  Similar to *Williams v. Mohawk*, the Court determines that given the Rule

12(b)(6) stage of the litigation, the plaintiffs' complaint must be taken as true and is sufficient to

allege an "enterprise" under RICO.  Service Defendants and the Manning Defendants have formed

an association-in-fact and they are distinct entities engaged in a conspiracy to recruit illegal

workers to work on the OCS to depress wages to the benefit of the Service Defendants.

Regarding a common purpose, in *Williams v. Mohawk*, the Eleventh Circuit determined that

the recruiters and Mohawk shared the common purpose of obtaining illegal workers for

employment by Mohawk and each recruiter was paid a fee, thus the act of racketeering had the

objective of reducing wages paid to Mohawk's hourly workforce.  465 F.3d at 1284.  The Eleventh

Circuit stated that "[w]hat is clear from the complaint is that each member of the enterprise is

allegedly reaping a large economic benefit from Mohawk's employment of illegal workers."  *Id.*

Similarly, here, the Service Defendants and Manning Defendants share the common purpose of

obtaining illegal workers for employment by the Service Defendants.  Each of the Manning

Defendants are paid fees by the Service Defendants who actually employ the illegal workers.  Dkt.

No. 66 ¶ 4.23.

Regarding a common purpose, the Complaint states that the Service Defendants have an

objective in using the Manning Defendants to recruit an illegal labor force to depress wage rates.

Dkt. No. 66 ¶ 4.13.  The Manning Defendants presumably have the same purpose in order to

collect their fees.  The "desire to make money" is a common purpose recognized by multiple

courts.  *United States v. Elliott*, 571 F.2d at 898; *Williams v. Mohawk*, 465 F.3d at 1284 (citing

*United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992)); *United States v. Tillet*, 763 F.2d 628,

631 (4th Cir. 1985).  The Eleventh Circuit also distinguished the Seventh Circuit decision of *Baker*,

cited here by multiple Defendants, where the members of the enterprise had divergent goals,

namely "the employer 'wants to pay lower wages; the recruiters want to be paid more for services

rendered (though [the employer] would like to pay them less); the Chinese Mutual Aid Association

wants to assist members of its ethnic group."  *Williams v. Mohawk*, 465 F.3d at 1285 (citing *Bakers

v. IBP, Inc.*, 357 F.3d at 691).  Here, the Complaint does not indicate that the Service Defendants

and Manning Defendants have divergent goals or that Manning Defendants desire to be paid any

more than their normal fees.

In addition, although Plaintiffs have not explicitly provided evidence of the "hierarchical

or consensual decision making structure", for the purpose of Rule 12(b)(6) the Plaintiffs have

alleged that the Service Defendants had a regularized manner of dealing with the Manning

Defendants.  Dkt. No. 66 ¶ 4.23.  Similar to *Williams v. Mohawk*, whatever difficulties Plaintiffs

may have of proving this management or decision making structure, Plaintiffs have adequately

alleged that Service Defendants are engaged in managing the enterprise.  In addition, in order for

the Service Defendants to obtain their goal of depressing wages, some sort of management or

coordination must have occurred.

The Court is of the opinion that the Third and Fourth Amended Complaint adequately

allege the existence of a RICO enterprise to survive a Rule 12(b)(6) motion to dismiss for failure to

state a claim upon which relief can be granted.

### 5.      Standing and Proximate Cause

#### a.      Parties' Positions

C-MAR Defendants argue that the predicate act must be the "but for" cause of the injury.

Dkt. No. 175 at 6.  C-MAR Defendants state that there is no "direct causal link," thus the

Plaintiffs lack standing under 18 U.S.C. § 1962(c) to assert a RICO claim.  *Id.*  C-MAR

Defendants explain that in *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1998, 164 L. Ed. 2d

720 (2006), the Supreme Court dismissed a RICO claim when it found that defendants' failure to

charge sales tax actually directly injured the authorities collecting taxings, not the plaintiff who

alleged artificially lower market prices resulting in defendants' gain of market share.  Dkt. No.

175 at 7; *see also* Offshore Defendants' Motion, Dkt. No. 176 at 8-9; Stolt's Motion, Dkt. No.

180 at 5.  C-MAR Defendants analogize *Anza* to the situation presented in this matter and argue

that the alleged immigration violation directly victimized the United States Department of

Homeland Defense.  Dkt. No. 175 at 7-8; *see also* Helix Motion, Dkt. No. 179 at 10-13.  Global

Defendants support this argument and add that by remanding *Mohawk Industries, Inc. v.*

*Williams* to the Eleventh Circuit, the Supreme Court indicated that it "considers the issues of

direct injury and proximate cause to be dispositive in a case involving the alleged hiring of

persons illegally in the United States."  Dkt. No. 177 at 9.

C-MAR Defendants allege that "intervening factors, and not the employment of foreign

nationals, may very well be the real cause of Plaintiffs' alleged injuries."  Dkt. No. 175 at 8.

Global Defendants state that the Seventh Circuit has questioned whether diminution in wages

based on hiring illegal aliens is a direct injury flowing from INA violations.  Dkt. No. 177 at 11

n.27 (citing *Baker v. IBP, Inc.*, 357 F.3d at 692); *see also* Offshore Defendants' Motion, Dkt. No.

176 at 10; Stolt's Motion, Dkt. No. 180 at 20.  C-MAR Defendants argue that Plaintiffs assume

that foreign nationals receive lower wages for the same skill set and experience and that foreign

nationals will never perform work as safely as their American counterparts.  Dkt. No. 175 at 8.

McDermott asserts that the "payment of 'wages' and the establishment of 'working conditions'

are aspects of legitimate business operations that are influenced and determined by a variety of

economic forces and factors."  Dkt. No. 178 at 21.  McDermott argues that it would take a

"complex assessment" to determine the change in wage levels and work conditions attributable

to the alleged hiring practices – an analysis discouraged by *Anza*.  *Id.* at 22 (quoting *Anza*, 126 S.

Ct. at 1998).

Plaintiffs state that *Anza*, cited by certain defendants, "only applies to claims where the

parties have no dealings with each other and the plaintiffs is [sic] an indirect victim," unlike the

situation here where the Plaintiffs' alleged injuries result from the Illegal Worker Hiring Scheme.

Dkt. No. 193 at 9-11.  Plaintiffs refer to the Complaint which states that each Plaintiff was

employed by one of the Service Defendants at depressed wages resulting from the Illegal Worker

Hiring Scheme.  *Id.* at 11.  Plaintiffs state that "wage depression is not derivative of an injury

suffered by any other party" and Plaintiffs state other circuits have held that workers are "direct

victims." *Id.* (citing *Trollinger v. Tyson Foods,* 370 F.3d 602, 617-18 (6th Cir. 2004) (holding

that workers rather than unions suffered a direct injury in connection with an alleged illegal-

immigrant-hiring-scheme); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1170 (9th Cir. 2002)

(holding that documented employees are the direct victims of the illegal hiring practices of fruit

growers, under RICO, by depressing wages by hiring undocumented workers); *Mohawk Indus. v.

Williams*, 411 F.3d 1252 (11th Cir. 2005), *vacated by* 126 S. Ct. 1997 (2006)).

Plaintiffs state that the Immigration Reform and Control Act ("IRCA"), codified at 8 U.S.C. §

1324a, prohibits the hiring of illegal immigrants.  Dkt. No. 193 at 7 (citing *Hoffman Plastic

Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 148-149 (2002)).  Plaintiffs aver that Congress and

the Supreme Court have recognized that hiring illegal immigrants depresses wages and lowers

working conditions of citizens and legally admitted aliens.  *Id.* at 7-8 (citing *A.P.R.A. Fuel Oil

Buyers Group, Inc.*, 320 N.L.R.B. 408, 413-14 (1995); *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883,

892 (1984)).  Plaintiffs state that a decade after IRCA was enacted, Congress amended RICO to

incorporate violations of section 274 of the INA.  *Id.* at 8 (citing 18 U.S.C. § 1961(1)(F)

(incorporating "any act which is indictable under the [INA], section 274 [8 USCS § 1324]

(relating to bringing in and harboring certain aliens."))  Plaintiffs argue that private actions, such

as this one, are the object of civil RICO.  *Id.* at 9 (citing *Rotella v. Wood*, 528 U.S. 549, 557

(2000)).

Plaintiffs further state that the U.S. government is not a "more direct victim" because

"acceptance of such an argument would mean no plaintiff would ever have standing to bring a

RICO or antitrust action, because all such claims involve the violation of federal statutes."  Dkt.

No. 193 at 12 (citing *Mendoza*, 301 F.3d at 1170; *Commercial Cleaning Services*, 271 F.3d 385).

Plaintiffs also argue that C-MAR Defendants' reliance on *Eli Lilly & Co. v. Roussell Corp.*, 23 F.

supp. 2d 460, 483 (D.N.J. 1998) for the proposition that there is no causal link between the hiring

of illegal workers on the OCS is inapposite because in *Eli Lilly*, the plaintiffs' injuries resulted

from intervening acts.  Dkt. No. 193 at 12.  Plaintiffs note the similarity to *Anza* and argue that

there are no intervening acts where the Illegal Worker Hiring Scheme depresses the Plaintiffs'

wages.  *Id.* (citing Complaint, Dkt. No. 66 ¶ 4.16).  Plaintiffs argue that "depressed wage rates . .

. need not be the sole cause of the injury to satisfy the proximate cause requirement."  *Id.* at 13

(citing *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 1373, 1383 (5th Cir. 1979)).

Plaintiffs also note that at the pleading stage of a civil RICO action, "general factual allegations

of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we

presume that general allegations embrace those specific facts that are necessary to support the

claim."  *Id.* (quoting *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 256

(1994)).  Plaintiffs assert that Defendants' positions, such as that of Stolt who contends that

Plaintiffs' statements regarding their acceptance of lower wage is conclusory and insufficiently

pled, are inconsistent with *Z-TEL* and *National Organization for Women, Inc.*  Dkt. No. 193 at

14.

McDermott argues that this case is distinguishable from the cases from the Sixth, Ninth,

and the Eleventh Circuit that were cited by Plaintiffs.  Dkt. No. 200 at 1.  In particular,

McDermott argues that *Williams v. Mohawk Industries, Inc.*, 411 F.3d 1252 (11th Cir. 2005) was

remanded for decision in light of *Anza*.  *Id.* at 2.  McDermott argues that the other cases are

distinguishable because the plaintiffs in the cited cases alleged control or participation in the

predicate acts, whereas in the Third Amended Complaint, the Plaintiffs do not allege any control

or participation by the Manning Defendants in the Illegal Worker Hiring Scheme.  Dkt. No. 200

at 2.  Offshore Defendants also note that the case cited by Plaintiffs, *DeCanas v. Bica*, 424 U.S.

351, 356-57 (1978), found that employment of illegal workers "'can' theoretically cause wage depression, not that it automatically does, and Plaintiffs do not (and cannot) allege in this case that Defendants' alleged conduct altered the entire employment market on the OCS."  Dkt. No. 201 at 6.

### b.      Analysis

A plaintiff has standing to bring a claim under RICO pursuant to 18 U.S.C. § 1964(c) which states:

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . .

The "by reason of" language of RICO has been interpreted by the Supreme Court and to require a showing that the violation was the "but for" cause and "proximate" cause of the injury. *Z-TEL*, 331 F. Supp. 2d at 559 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 279 (1992)).  This Court stated in *Z-TEL Communications*:

> A complaint does not need to make a large number of allegations relating to the injury suffered. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S.Ct. 2130 2130 (1992) (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990)).

331 F. Supp. 2d at 560; accord, *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994). The Supreme Court in *Bell Atlantic Corp.* provided that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  127 S. Ct. 1955, 1969 (citing *Sanjuan v. American Bd. of Psychiatry & Neurology*, 40 F.3d 247, 251 (7th Cir. 1994); *National Organization for Women, Inc.*, 510 U.S. at 256).

This Court addresses whether there is a direct injury and proximate causation.   *Holmes*,

503 U.S. at 268-69.  The Defendants argue that *Anza* should apply because *Williams v. Mohawk* was remanded in light of *Anza*.  The parties had previously debated the application of *Williams v. Mohawk Indus.*, 411 F.3d 1252 (11th Cir. 2005).  *See* Dkt. No. 193 at 11 n.11.  The Supreme Court had granted the petition for writ of certiorari.  *Mohawk Indus. v. Williams*, 546 U.S. 1075 (2005).  This Court stayed the case until a ruling by the Supreme Court.  Dkt. No. 159 at 2.  The Supreme Court dismissed the petition as "improvidently granted" and the case was remanded to the Eleventh Circuit for consideration in light of *Anza*.  *Mohawk Indus. v. Williams*, 126 S.Ct. 2016 (2006).  Thereafter, the Eleventh Circuit reinstated and modified in part its previous opinion.  *Williams v. Mohawk Indus.*, 411 F.3d 1252 (2006).

The Defendants argue that *Anza* indicates that Plaintiffs are not the direct victims.  In *Anza*, Ideal Steel Supply Corporation (Ideal) sued National Steel Supply, Inc. (National) because National "adopted a practice of failing to charge the requisite New York sales tax to cash-paying customers . . . [which] allowed National to reduce its prices without affecting its profit margin." *Anza*, 126 S. Ct. at 1994.  The Supreme Court explained that Ideal's theory was that National defrauded the New York tax authority and used the proceeds to offer lower prices, while the RICO violation was mail fraud and wire fraud.  *Id.* at 1996-97.  The Supreme Court noted that "[i]t was the State that was being defrauded and the State that lost tax revenue as a result."  *Id.* at 1997.  The Supreme Court found a lack of proximate causation because the "cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."  *Id.*  In viewing this from a directness requirement analysis, the Supreme Court explained that the "injury Ideal alleges is its own loss of sales resulting from National's decreased prices for cash-paying customers.  National, however, could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud."

38

*Id.*  Noting a second discontinuity, the Supreme Court explained that "Ideal's lost sales could have resulted from [other factors and] . . . it would require a complex assessment to establish that portion of Ideal's lost sales were the product of National's decreased prices."  *Id.*  Thus, the Supreme Court explained that "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Id.* at 1998.

In *Williams v. Mohawk*, the Eleventh Circuit modified its prior opinion in light of *Anza*. 465 F.3d at 1281.  In *Mohawk*, plaintiffs alleged that Mohawk "conspired with recruiting agencies to hire and harbor illegal workers in an effort to keep labor costs as low as possible," which, as a result, allowed "Mohawk to depress the wages it pays its legal hourly workers."  *Id.* at 1281-82.  The Eleventh Circuit required that the plaintiffs show "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation."  *Id.* at 1283.

In determining whether there was a "business or property" interest, the Eleventh Circuit first stated that the plaintiffs had a business interest similar to *Mendoza*, "where legally documented agricultural workers sued fruit growers under RICO alleging that the growers depressed wages by hiring illegal workers."  *Id.* at 1286.  The Eleventh Circuit agreed with the Ninth Circuit which found that the employees properly alleged "a legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes."  *Id.* (citing *Mendoza*, 301 F.3d at 1168 n.4).  Here, like in *Mendoza* and *Mohawk*, the Plaintiffs have a similar injury to business.

Addressing the "by reason of" requirement, the Eleventh Circuit noted that two concepts are implicated: "(1) a sufficiently direct injury so that a plaintiff has standing to sue; and (2)

proximate cause." *Mohawk*, 465 F.3d at 1287 (citing *Trollinger*, 370 F.3d at 613 (noting that the two concepts overlap)).  Under "proximate cause" of a RICO case, "there must be 'some direct relation' between the injury alleged and the injurious conduct." *Id.* at 1288.  In evaluating *Anza*, the Eleventh Circuit noted that when evaluating the causal connection of proximate cause courts must consider (1) the motivating principles behind the directness component, such as the ability to ascertain the amount of plaintiff's damages attributable to the violation; and (2) the risk of duplicative recoveries. *Id.* at 1288 (quoting *Anza*, 126 S. Ct. at 1997).  The Eleventh Circuit determined that "Mohawk's widespread scheme of knowingly hiring and harboring illegal workers has the purpose and direct result of depressing the wages paid to the plaintiffs." *Id.* at 1289 (citing *DeCanas v. Bica*, 424 U.S. 351, 356-57 (1976) ("explaining that 'acceptance by illegal aliens of jobs on substandard terms as to wage and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens'")).

Here, like in *Trollinger*, *Mendoza*, and *Williams v. Mohawk*, the Court determines that Plaintiffs were directly injured by Defendants' RICO violations.  Similar to the complaint in *Mohawk*, Plaintiff's Amended Complaint alleges that the Service Defendants harbored and knowingly employed thousands of illegal workers in an Illegal Worker Hiring Scheme in order to depress wages. *See* Dkt. No. 66 ¶¶ 4.23-4.29.  At this stage of the litigation, this Court must assume that these allegations are true and determines that there is a sufficiently direct relation between the Plaintiffs' claimed injury and the alleged RICO violations.

The Court also determines that the issue of whether the U.S. government is a more direct victim does not preclude Plaintiffs' cause of action.  As explained by the Second Circuit:

> If the existence of a public authority that could prosecute a claim against putative RICO defendants meant that the plaintiff is too remote under *Holmes*, then no private cause of action could ever be maintained, for every RICO predicate offense, as well as the RICO enterprise itself, is separately prosecutable by the

government. In *Holmes*, those directly injured could be expected to sue, and their recovery would redound to the benefit of the plaintiffs suing for indirect injury.

*Commercial Cleaning Servs. v. Colin Serv. Sys.*, 271 F.3d 374, 385 (2d Cir. 2001). In *Mohawk*, defendant Mohawk also asserted that the United States was the direct victim due to its interest in enforcing immigration laws. The Eleventh Circuit rejected this argument and stated that "[i]t is consistent with civil RICO's purposes - to expand enforcement beyond federal prosecutors with limited public resources - to turn victims (here, Mohawk's legal workers) into prosecutors as private attorneys general seeking to eliminate illegal hiring activity by their *own* employer." *Mohawk*, 465 F.3d at 1290 (emphasis in original). The Plaintiffs are directly injured by the depressed wages and the Court agrees with the Plaintiffs that the Complaint does not allege an immigration violation that victimized the United States Department of Homeland Defense. Dkt. No. 193 at 12.

The Defendants assert that there may be other intervening factors that caused the injury to Plaintiffs. However, as explained in *Trollinger*, "plaintiffs need not show that [defendant's] conduct was the sole cause of their injury in order to establish proximate cause; they need show only that the conduct was a substantial cause." 370 F.3d at 620. Here, taking Plaintiffs' allegations to be true, this Court determines that Plaintiffs have met the requirements for defeating a motion to dismiss.

The Eleventh Circuit further rejected defendant's argument that "the cause of plaintiffs' alleged harms is a set of actions (paying lower wages) 'entirely distinct' from the alleged RICO violation (hiring illegal workers)." *Mohawk*, 465 F.3d at 1290. The Eleventh Circuit noted that "it has long been recognized that hiring illegal workers on substandard wage terms depresses the wage scales of legal workers." *Id.* The Eleventh Circuit also recognized that the plaintiffs were

suing on a narrow complaint related to depressed wages in "manufacturing facilities in north

Georgia." *Id.* Similarly, here, the Plaintiffs are alleging depressed wages among ten defendants

all recruiting on the limited geographical region of the OCS.

This Court's conclusion is similar to that of the Sixth, Ninth, and Eleventh Circuits

regarding proximate cause as well as the standing issue. Similar to the situation in *Mendoza* and

*Mohawk*, the most direct victims of the illegal conduct are the Plaintiffs. *Mohawk*, 465 F.3d at

1292 (citing *Mendoza*, 301 F.3d at 1170).

Similar to the situation in *Trollinger*, at this stage of the litigation, the Court must assume

Plaintiffs allegations are true and that Plaintiffs will be able to prove their allegations are true,

and as there has been no discovery or expert reports, the Court is unable to make a determination

that there is no proximate cause without further evidence. *See Trollinger*, 370 F.3d at 619-20.

Therefore, the Court concludes that Plaintiffs have met the requirements of proximate cause and

standing.

### 5.     Injunctive Relief Under RICO

#### a.     Parties' Positions

C-MAR Defendants argue that the Fifth Circuit has stated that "RICO does not authorize

injunctive relief for a private plaintiff to prevent future economic losses." Dkt. No. 175 at 9; *see*

*also* Global Defendants' Motion, Dkt. No. 177 at 12 (citing *In re Fredeman Litig.*, 843 F.2d 821,

828 (5th Cir. 1998)); McDermott Motion, Dkt. No. 178 at 22; Helix Motion, Dkt. No. 179 at 27

(citing *Religious Tech. Ctr. v. Wollerscheim*, 796 F.2d 1076, 1080-89 (9th Cir. 1986); *Trane Co.*

*v. O'Connor Secs.*, 718 F.2d 26, 28 (2d Cir. 1983); *Dan River, Inc. v. Icahn*, 701 F.2d 278, 290

(4th Cir. 1983)); Offshore Defendants' Motion, Dkt. No. 176 at 12. McDermott argues that the

Fifth Circuit, in dicta, has expressed that no such relief is available.  Dkt. No. 200 at 9 (citing

*Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 977 n.42 (5th Cir. 2000); *Conkling v. Turner*, 18 F.3d 1285, 1296 n.8 (5th Cir. 1994)).

Plaintiffs argue that Helix, Stolt, and C-MAR Defendants incorrectly assert that injunctive relief is not available under RICO, according to their interpretation under *In re Fredeman Litigation*, 843 F.2d 821, 828 (5th Cir. 1998).  Dkt. No. 193 at 25.  Plaintiffs interpret the case to say that only particular types of injunctions are not authorized under RICO, but not all injunctions, and Plaintiffs note that the injunctions it seeks are restraint of further RICO violations, not freezing of assets as described in *In re Fredeman Litigation*.  *Id.*  Plaintiffs cite to the Fifth Circuit decision of *Richard v. Hoechst Chemical Group Inc.*, 355 F.3d 345, 354-55 (5th Cir. 2003) as indicating that the issue of injunctive relief under RICO is unsettled.  Dkt. No. 193 at 25.

### b.      Analysis

The cases cited by both parties are in agreement that the Fifth Circuit has not decided whether equitable relief is available for private civil RICO plaintiffs under 18 U.S.C. § 1964 (a) - (c).  *Richard v. Hoechst Celanese Chem. Group, Inc.*, 355 F.3d at 354.   There is currently a split among the circuits regarding whether injunctive relief is available under RICO.  *See Conkling v. Turner*, 18 F.3d 1285, 1296 n.8 (5th Cir. 1994) (listing multiple cases disagreeing on this issue). In *Conkling*, noting the split, the Fifth Circuit expressly declined to decide the issue.  *Id.* at 1296. In *In re Fredeman Litigation*, the Fifth Circuit only went as far as declining to provide equitable relief to freeze particular assets.  843 F.2d at 830.  The Fifth Circuit recognized that some commentators have recognized that equitable relief should be available and the Fifth Circuit refused to decide "whether all forms of injunctive or other equitable relief are foreclosed to private plaintiffs under RICO."  *Id.* at 828, 830.  In *Bolin v. Sears Roebuck & Co.*, the Fifth

43

Circuit expressed "considerable doubt that injunctive relief is available to private plaintiffs under

RICO," but, under the circumstances, assumed that injunctive relief was available because the

Defendant did not take issue with the claim.  231 F.3d at 977 n.42.  The Fifth Circuit came close

to recognizing some form of equitable relief in accepting the Second Circuit's view that, at least

as pertains to § 1964(a), equitable remedies are proper to prevent and restrain future conduct and

1964(a) stated three examples of permissible remedies that were "forward-looking, and focused

on preventing future RICO violations."  *Richard*, 355 F.3d at 354 (citing *United States v. Carson*,

52 F.3d 1173, 1181 (2d Cir. 1995)).

Here, this Court declines to decide whether equitable relief is available under RICO.  The

Plaintiffs here seek injunctions under 18 U.S.C. § 1964(a) of RICO against the behavior alleged

as a predicate act in its RICO action and under 43 U.S.C. § 1349(a)(5) of OCSLA.  Dkt. No. 66 ¶

9.2.  At this stage of litigation the Court will assume that this remedy is available.

## C.      Negligence

The Plaintiffs allege negligence against the Defendants, and the entire cause of action in

the Third Amended Complaint states:

> Separate from the foregoing allegations regarding violations of RICO, and in the
> alternative, the Service Defendants and Manning Defendants were negligent in
> their hiring practices, resulting in unsafe work conditions and real or potential
> bodily injury to the Plaintiffs, which negligence is the proximate cause of
> Plaintiff's personal and bodily injuries, depressed wages and unsafe working
> conditions.

Dkt. No. 66 at 19.

Global Defendants argue that Plaintiffs "have failed to allege any facts supporting the

elements of a negligence claim."  Dkt. No. 177 at 13 (citing *In re Plywood Antitrust Litig.*, 655

F.2d 627, 641 (5th Cir. 1981)).  Oceanwide Offshore argues that although the Fifth Circuit does

not require a parsing of a negligence allegation into separate elements, Rule 8(a)(2) requires that

fair notice must be provided wherein the complaint outlines the violation and connects the violation to the named defendants.  Dkt. No. 199 at 3.

Plaintiffs generally argue that the Fifth Circuit supports the "minimalist" standard of pleading negligence claims under Rule 8.  Dkt. No. 193 at 27 (citing *General Electric Capital Corp. v. Posey*, 415 F.3d 391, 396-97 (5th Cir. 2005)).

In *Posey*, the Fifth Circuit asserted that Form 9, the negligence form in the Appendix of Forms of the Federal Rules of Civil Procedure, was adequate pursuant to Federal Rules of Civil Procedure Rule 84 which states that the "forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate."  *Posey*, 415 F.3d at 396.  In *Twombly*, the Supreme Court clarified *Conley's* standard of an adequate pleading and concluded by stating, "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 127 S. Ct. at 1973.  Contrasting the complaint in negligence action versus that of the Sherman Act, the Supreme Court explained that the "bare allegation" of Form 9 in a negligence action would have given the notice required by Rule 8, and a "defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin."  *Id.* at 1971 n.10.  Here, the Plaintiffs have provided sufficient notice for the negligence allegations.

    **1.**    **Duty**

        **a.**    **Parties' Positions**

Oceanwide Offshore argues that there were no facts alleged, no demonstration of a legal duty, nor damages proximately caused by a breach of duty.  Dkt. No. 167 at 6 (citing *HIS Cedars*

*Treatment Center v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *McLennan v. American Eurocopter Corp.*, 245 F.3d 403, 432 (5th Cir. 2001)); *see also* C-MAR Defendants' Motion, Dkt. No. 175 at 10; Global Defendants' Motion, Dkt. No. 177 at 13; McDermott's Motion, Dkt. No. 178 at 23.  Helix argues the only plaintiff with any relationship with Helix is Rafael Young, and the legal obligation to Young arises from his employment relationship governed by contract law, not tort law.  Dkt. No. 179 at 29.  Offshore Defendants makes the same argument as Helix and stated that the negligence claims as per the Plaintiffs it did not employ must be dismissed as a matter of law.  Dkt. No. 176 at 24.  McDermott asserts that Plaintiffs' "negligent hiring" claim is frivolous.  Dkt. No. 178 at 24.  Stolt argues that it never hired nor employed any of the Plaintiffs, therefore, there was never any employment relationship between any of the Plaintiffs and Stolt.  Dkt. No. 226 at 6 (citing *Sheppard v. Beaird-Poulan, Inc.*, 617 F.2d 87 (5th Cir. 1980) (dismissing class action claims where a named class representative did not have sufficient nexus with proposed class members)); *see also* Dkt. No. 180 at 12-13.

As Plaintiffs indicated above, under the negligence pleading requirements, Plaintiffs assert that "[f]ederal pleading standards do not require the allegations of negligence be parsed into individual elements."  Dkt. No. 193 at 28.  Plaintiffs also state that the concept of legal duty varies on the governing state law, which has not yet been determined.  *Id.*

### b.    Analysis

With regard to Stolt, none of the named Plaintiffs were ever employed by Stolt, and the Complaint is alleging that each of the Service Defendants has a separate enterprise with the Manning Defendants.  Without a named Plaintiff previously employed by Defendant Stolt, the Court does not find a sufficient nexus between any of named class representatives and the proposed class members. *See Sheppard*, 617 F.2d at 88.  The Plaintiffs are seeking to prove that

the recruiting practices of each Service Defendant with the Manning Defendants resulted in

unsafe working conditions.  As such, a class representative must have commonality and typicality

as to that particular relationship between each Service Defendant and the Manning Defendants.

The manner in which Stolt coordinated with the Manning Defendants in negligently hiring illegal

workers may have been different than that of the other Service Defendants.  Therefore,

employees of the other Service Defendants are not adequate class representatives of Stolt's

employees.  The negligence action is dismissed as to Stolt.

As per the other defendants, at this stage in litigation the governing law has not been

decided.  Therefore, at this stage of the litigation, the Plaintiffs have sufficiently alleged a

negligence claim.

### 2.    Damages

#### a.    Parties' Positions

Oceanwide Offshore also notes that a "claim of economic loss . . .  will not support a

negligence cause of action."  *Id.* (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-45

(Tex. 1991)); *see also* C-MAR Defendants' Motion, Dkt. No. 175 at 10; Global Defendants'

Motion, Dkt. No. 177 at 14; Helix's Motion, Dkt. No. 179 at 31; Offshore Defendants' Motion,

Dkt. No. 176 at 26-27.

Plaintiffs argue that its negligence claim alleges "personal and bodily injuries" and

"depressed wages and unsafe working conditions."  Dkt. No. 193 at 29 (citing Complaint, Dkt.

No. 66 ¶ 5.1).  Plaintiffs state that facts plead in the complaint must be taken as true, its

Complaint is not barred by the economic loss doctrine.  *Id.* (citing *Lowrey v. Texas A&M Univ.

Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *Lone Star Milk Producers, Inc. v. Dairy Farmers of

America, Inc.*, No. 5:00-CV-191, 2001 WL 1701532 (E.D. Tex., Jan. 22, 2001)).

### b.      Analysis

Taking the Plaintiffs' allegations to be true, the Court assumes that there are personal and bodily injuries.  Thus, the Economic Loss Doctrine would not apply.

### 3.      Federal and State Compensation Laws

### a.      Parties' Positions

Offshore Defendants argue that, although the Third Amended Complaint "contains no allegations regarding what specific jobs each of the Plaintiffs held with the Service Defendants . . . [i]f they were seamen while employed by [Defendants], they cannot maintain a negligence cause of action against [Defendants] under the general maritime law."  Dkt. No. 176 at 25.  Offshore Defendants argue that the Jones Act, 46 U.S.C. § 688, "provides the exclusive recovery in negligence for claims by seamen against their employers."  *Id.* (citing *Miles v. Apex Marine*, 498 U.S. 19, 29 (1990); *Beltia v. Sidney Torres Marine Transport, Inc.*, 701 F.2d 491, 493 (5th Cir. 1983)).  Offshore Defendants note that, though the Third Amended Complaint does not assert a claim under the Jones Act, any such claim would be subject to dismissal because under the Jones Act, "a seaman must have sustained actual physical injury or tortious physical contact to recover against his employer."  *Id.* (citing *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 477-78 (5th Cir. 2001)).  Alternatively, Offshore Defendants argue that if the Plaintiffs were not seamen, but rather longshoremen, their exclusive remedy in tort would be under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq*.  Dkt. No. 176 at 26.  Offshore Defendants provide that if Plaintiffs were neither seamen nor longshoremen, then state law applies and the Texas Workers' Compensation Act acts as the exclusive remedy.  *Id.*

Plaintiffs argue that the Texas state compensation act "does not apply to activities conducted on OCS."  Dkt. No. 193 at 30.  Plaintiffs argue that the LHWCA is mutually exclusive

with the Jones Act, which allows claims for negligence.  *Id.* at 31.  Plaintiffs state that the Jones

Act applies for a seaman who suffers injury while the LHWCA excludes from coverage "a

master or member of a crew of any vessel."  *Id.* at 31-32 (citing 33 U.S.C. § 902(3)(G)).

Plaintiffs argue that these factual determinations may later become relevant, but the

determination of Plaintiffs' seamen status "is not relevant to a determination of whether the

negligence allegation was properly made."  *Id.* at 32.

> **b.**     **Analysis**

As explained above, the Court requires more information requiring the context of the

workers on the vessels involved in the project before it can rule on the application of the INA to

those illegal workers.  Likewise, the Court would require information about the class members

represented by the Plaintiffs before determining the application of the various statutes.  At this

stage in the litigation the Plaintiffs have properly pled their allegations of negligence, and the

Court will wait until the factual record is developed before determining matters concerning

preemption.

**D.**     **Violation of Outer Continental Shelf Lands Act, 43 U.S.C. § 1331**

In Plaintiffs' Complaint, the Plaintiffs state that OCSLA, 43 U.S.C. § 1356 (codified at

33 C.F.R. § 141, *et seq.*) requires "any vessel, rig, platform, or other vehicle or structure which is

used for OCS activities, be manned or crewed by citizens of the United States and no more than

twenty-five (25%) aliens lawfully admitted to the United States for permanent residence."  Dkt.

No. 66 at 20.  Plaintiffs allege that Defendants' hiring practices violate and continue to violate

OCSLA and as a result have depressed wages, reduced benefits, and degraded working

conditions.  *Id.*

Global Defendants, without citing authority, state that Plaintiffs have failed to plead

specific facts, thus Plaintiffs' OCSLA claim should be dismissed.  Dkt. No. 177 at 15.

The parties have not cited, and the Court has not found, any case law that suggests a heightened pleading standard for OCSLA.  Therefore, the Court determines that the general pleading standards set forth by Rule 8 and *Twombly* shall govern.  However, regarding Stolt, the Court determines that since none of the named Plaintiffs was ever employed by Stolt, there is not a sufficient nexus between the Plaintiffs and the proposed claims members with regard to Stolt. *See* Dkt. No. 180 at 12-13.  Therefore, the OCSLA claims are dismissed with regard to Stolt.

### 1.    Private Right of Action

### a.    Parties' Positions

Oceanwide Offshore argues that "OCSLA does not provide for a private right of damages."  Dkt. No. 167 at 5 (citing *Olsen v. Shell Oil Co.*, 561 F.2d 1178, 1189 (5th Cir. 1977)); *see also* Global Defendants' Motion, Dkt. No. 177 at 16; Helix Motion, Dkt. No. 179 at 27-28.  Oceanwide Offshore states that the case cited by Plaintiff held that the "LHWCA [Longshore and Harbor Workers' Compensation Act] . . . [is] the exclusive remedy of an injured employee against his or her employer." *Wentz v. Kerr-McGee Corp.*, 784 F.2d 699, 702 (5th Cir. 1986)).  Oceanwide argues that the language of § 1349(a) does not provide for a private right of action for "enforcement and damages," as submitted by Plaintiffs; rather, the only new right created by § 1349(a) is to enforce the OCSLA and any regulations promulgated pursuant to it, in other words, as a "private attorney general" with regard to OCSLA enforcement.  Dkt. No. 199 at 6 (citing *Wentz*, 784 F.2d at 701).  C-MAR Defendants add that OCSLA only authorizes private actions to compel compliance with OCSLA under 43 U.S.C. § 1349(a)(1), not for a private right of action for damages under 43 U.S.C. § 1356.  Dkt. No. 175 at 10-11; Dkt. No. 176 at 29.  Stolt argues that the Surface Mining Control and Reclamation Act and *Molinary v. Powell Mountain*

*Coal Co.*, 125 F.3d 231 (4th Cir. 1997), which the Plaintiffs rely on to provide a private right of

action, allow a person to bring an action who is injured "in his person or property" and is not

comparable to section 1349.  Dkt. No. 226 at 9.  Oceanwide Offshore reasserts that § 1349(b)

applies only to jurisdiction and venue, and OCSLA "only allows a private party to bring an

enforcement suit and to potentially collect penalties, which are limited to the costs of litigation."

Dkt. No. 199 at 6 (citing 43 U.S.C.A. § 1349(b)(5)).

　　　Plaintiff argues that 43 U.S.C. § 1349 "assists in furthering the goals of OCSLA as

national policy."  Dkt. No. 193 at 34.  Plaintiffs also state that there is "no conflict between 43

U.S.C. § 1350, which provides for remedies and penalties brought by the government under its

own right to sue for OCSLA violations, and 43 U.S.C. § 1349(b)(2), which gives that right to

private citizens."  *Id.* at 34 n.22 (citing 43 U.S.C. § 1350(e) (providing that the remedies and

penalties are concurrent and cumulative)); *see also id.* at 39-40.  Plaintiffs state that OCSLA was

amended in 1978 to provide a private right of action for damages under 43 U.S.C. § 1349(b)(2)

using language identical to the Surface Mining Control and Reclamation Act of 1977 provide a

private right of action for damages.  *Id.* at 39-40.  Plaintiffs state that the case law cited by

Defendants was decided either before the 1978 amendments or was factually and legally specific

to claims under the LHWCA.  *Id.* at 41.  Referring to the Fifth Circuit decision in *Wentz*,

Plaintiffs state that the holding was narrow in precluding an additional right of action for

damages involving personal injury or death, but the Fifth Circuit acknowledged the potential for

a new cause of action in tort for injured employees against their employers.  *Id.* at 42 (citing

*Wentz*, 784 F.2d at 701).

　　　McDermott replies that Plaintiffs attempt to limit the holding of *Olsen* and *Wentz* which

clearly explained that the "'only new private right of action created by § 1349 is contained in §

1349(a)' which does not provide for the recovery of damages."  Dkt. No. 200 at 9-10 (citing

*Wentz*, 784 F.2d at 701); *see also* Offshore Defendants' Reply, Dkt. No. 201 at 8.

### b.      Analysis

Plaintiffs bring an action against Defendants for violating 43 U.S.C. § 1356 by

intentionally or negligently manning or crewing vessels with crew compliments unauthorized by

law and depressing wages, reducing benefits and degrading the work conditions of Plaintiffs and

those similarly situated.  Dkt. No. 66 ¶¶ 6.1-6.7.

Plaintiffs state that there is "no conflict between 43 U.S.C. § 1350, which provides for

remedies and penalties brought by the government under its own right to sue for OCSLA

violations, and 43 U.S.C. § 1349(b)(2), which gives that right to private citizens."  The

jurisdiction and venue provisions of OCSLA state:

> (2) Any resident of the United States who is injured in any manner through the
> failure of any operator to comply with any rule, regulation, order, or permit issued
> pursuant to this Act may bring an action for damages (including reasonable
> attorney and expert witness fees) only in the judicial district having jurisdiction
> under paragraph (1) of this subsection.

43 U.S.C. § 1349(b)(2).  Plaintiffs also cite to § 1350(e) which states:

> (e) Concurrent and cumulative nature of penalties. The remedies and penalties
> prescribed in this Act shall be concurrent and cumulative and the exercise of one
> shall not preclude the exercise of the others. Further, the remedies and penalties
> prescribed in this Act shall be in addition to any other remedies and penalties
> afforded by any other law or regulation.

> In *Wentz*, the Fifth Circuit explained:

> The only new private right of action created by § 1349 is contained in § 1349(a).
> This provision permits a private citizen to bring suit to enforce the OCSLA and
> any regulations promulgated pursuant to it, and to seek civil penalties.  A citizen
> thus may become a "private attorney general" with regard to OCSLA
> enforcement.  The scope of this provision may be potentially far-reaching.  But it
> is an enforcement action, not a strict liability tort claim for personal injury as
> appellants assert in these cases.

*Wentz*, 784 F.2d at 701.  The appellants in *Wentz*, like the Plaintiffs here, also argued that §

1350(e) supported a cause of action under OCSLA; however, the Fifth Circuit rejected this

argument by stating that section 1350 "makes no reference to the recovery of damages for

injuries to private parties.  Nor was any intended."  *Id.* at 702.  In *Romero v. Mobil Exploration

and Producing North America, Inc.*, the Fifth Circuit reiterated its decision in *Wentz* and further

declared that "[m]ore recent cases have underscored the unanimous *Cort* Court's reluctance to

imply civil causes of action from statutes such as [OCSLA]."  *Romero*, 939 F.2d 307, 310 (5th

Cir. 1991) (citing *Cort v. Ash*, 422 U.S. 66 (1975)).  This Court determines that there is no

private right of action under OCSLA, and Plaintiffs claims pursuant to OCSLA are dismissed.

## IV.  CONCLUSION

For these reasons, Defendants' motions (Dkt. Nos. 220, 221, 222, 223, 224, 225, and 232)

shall be **DENIED-IN-PART** with respect to the RICO and Negligence claims and **GRANTED-**

**IN-PART** with respect to the OCSLA claim.  Stolt's Motion to Dismiss (Dkt. No. 226) shall be

**GRANTED**.

**SIGNED this 30th day of January, 2008.**

DAVID FOLSOM
UNITED STATES DISTRICT JUDGE